2012 Ark. App. 123

**Helen Freeman LYNCH, Appellant**

v.

**Harrell BATES and Vivian Bates, Appellees.**

No. CA 11–77.

Court of Appeals of Arkansas.

Feb. 8, 2012.

Rehearing Denied March 14, 2012.

James Franklin Lane, Conway, for appellant.

Robert W. Henry, Conway, for appellee.

ROBIN F. WYNNE, Judge.

Helen Freeman Lynch appeals from a decree of the circuit court in which the court found that Harrell and Vivian Bates owned certain property by adverse possession and vested the property in them. In

her brief, appellant argues that the court erred in finding that appellees own the property by adverse possession. We reverse and remand.

The parties own adjoining tracts of land in Faulkner County. At one time, all of the property was owned by a Mr. Mallen. In 1971, Mr. Mallen conveyed appellant's land to her and her husband Alvan.[1] The land owned by appellees was conveyed by Mr. Mallen to Dale and Amelia Langford in 1975, from Amelia Langford to a couple named Massey in 1992, and to appellees in 1998. Alvan Lynch had a survey of the property performed in August 1998 that showed the fence lines on the property. The survey shows that along the east/west property line, the fence takes roughly a thirty-degree turn (the parties and the circuit court refer to it as a "jog"), creating a triangle of land that is on appellant's side of the property line but appellees' side of the fence. That piece of land forms the basis for this litigation. A survey performed for Mr. Massey and Harrell Bates in June 1998 shows that the jog deviates from the property line.

At some point prior to December 2006, the Lynches sought to rebuild the fence along the property line and without the jog in it. Appellees objected and filed a complaint for injunction in which they sought to enjoin the Lynches from rebuilding the fence until ownership of the disputed property was determined. The Lynches filed an answer and counterclaim to quiet title. In the counterclaim, the Lynches allege that Mr. Lynch and Dr. Langford built the jog in the fence with the knowledge that the new fence would not correspond to the property line.

At the trial, Harrell Bates testified that the jog in the fence was in the same place as it was when he bought the property in 1998. He also testified that he was certain the jog was in the fence when the fence was built by Mr. Mallen. According to Mr. Bates, when he bought the property, he understood that he was getting everything inside the fence and has paid taxes on everything inside the fence. While he has owned the property, Mr. Bates has bushhogged the land enclosed in the jog and has repaired the jog. The first indication he had that anyone else claimed ownership of the disputed property was when appellant attempted to build a straight fence.

Roger Bates, who was approximately forty years old at the time of the trial, testified that the jog in the fence was there in the early 1980s when he was twelve or thirteen years old and was in the same place it was at the time of the trial. Terry Bates gave substantially the same testimony. Rocky Lynch, Alvan Lynch's son, testified that Alvan told him about the unusual offset in the fence and that it was not a big deal to Alvan. Rocky testified that the jog was present in the fence in 1973 or 1974. Rocky further testified that Alvan told him he bought the land with the jog and offset. James Ross, a registered land surveyor, testified that the jog appeared on all of his surveys of the property, the earliest of which was in June 1998.

Carl Woods, who had lived near the property since 1959, testified that Mr. Mallen put up the fence when he sold part of his property to the Lynches, and the fence was straight at that time. According to Woods, Alvan Lynch and Dale Langford agreed to put the jog in the fence three to four years after Alvan and appellant bought the property after Alvan got a tractor stuck on that part of the property on a couple of occasions. Appellant testified that the agreement to put the jog in

---

1. Alvan Lynch died during the course of this litigation.

the fence was a neighborly one between her late husband and Dale Langford, and that it was done with the understanding that the pre-existing property lines would stay the same.

After the trial, the circuit court entered a letter order in which it found that the jog was incorporated into the fence for convenience and not to relocate the property line, meaning the jog cannot be a boundary line by acquiescence. The court also found that the survey performed for Alvan Lynch in 1998 put him on notice that the property was under the control of appellees, thus fulfilling the open, hostile, continuous, and notorious requirements for ownership by adverse possession. The circuit court entered a decree granting ownership of the disputed property to appellees on October 18, 2010. This timely appeal followed.

We review cases that traditionally sound in equity de novo on the record but will not reverse a finding of the trial court unless it is clearly erroneous. *Slaton v. Slaton,* 336 Ark. 211, 983 S.W.2d 951 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Id.*

Appellant appeals from a finding that appellees acquired title to the disputed property by adverse possession. Adverse possession is governed by both common and statutory law. To prove the common-law elements of adverse possession, a claimant must show that he has been in possession of the property continuously for more than seven years and that his possession has been visible, notorious, distinct, exclusive, hostile, and with the intent to hold against the true owner. *Smith v. Smith,* 2011 Ark. App. 598, 385 S.W.3d 902; *Trice v. Trice,* 91 Ark.App. 309, 210 S.W.3d 147 (2005). It is ordinarily sufficient proof of adverse possession that the claimant's acts of ownership are of such a nature as one would exercise over his own property and would not exercise over the land of another. *Id.* Whether possession is adverse to the true owner is a question of fact. *Id.* In 1995, the General Assembly added, as a requirement for proof of adverse possession, that the claimant prove color of title and payment of taxes on the subject property or contiguous property for seven years. *See* Ark.Code Ann. § 18–11–106 (Supp.2011). Where the original entry on another's land was amicable or permissive, possession presumptively continues as it began, in the absence of an explicit disclaimer. *Terral v. Brooks,* 194 Ark. 311, 108 S.W.2d 489 (1937); *McWilliams v. Schmidt,* 76 Ark. App. 173, 61 S.W.3d 898 (2001).

The circuit court concluded in the letter order that the jog was incorporated into the fence for the convenience of the parties and not as an intention to relocate the property line, thereby defeating appellees' claim of a boundary by acquiescence. That finding has not been appealed. Although the court does not expressly state that it believed the jog was put into the fence by Alvan Lynch and Dale Langford, it appears to credit Mr. Woods's testimony that the jog was placed in the fence when those two parties owned the respective pieces of property. Despite this, the court goes on to say that the 1998 survey put Alvan Lynch on notice that the property contained in the jog was part of his property but under the control of appellees. According to the court this satisfies the open, hostile, continuous, and notorious requirement to establish ownership by adverse possession.

However, if Alvan Lynch was involved in the construction of the jog, which the court found was constructed for the benefit of

the parties, we fail to see what effect the 1998 survey would have. Under these circumstances, Alvan Lynch would have been aware the entire time that the fence was originally straight and was moved to include a portion of his property on the opposing side of the fence. In effect, the circuit court made a ruling based, in part, on a determination that Alvan Lynch was a party to taking a straight fence and rebuilding it to move a portion onto his side of the fence line, but based also in part on the premise that he was unaware that the fence encroached onto his property until 1998. If the fence was constructed when Alvan Lynch owned one of the subject properties, the 1998 survey cannot serve as the act that started the clock running for the purposes of adverse possession.

The circuit court found that the fence was moved in order to benefit both parties with no intent to change the property lines. The record shows that, after the fence was altered, the residents on appellees' side of the fence bushhogged it and ran horses on it for many years without disagreement with the Lynches. The clear implication from the record is that the use of the land by appellees' predecessors in title was amicable between them and the Lynches. Because the initial use of the property by appellees' predecessors in title was amicable, possession of the property would continue as it began absent an express disclaimer. *Terral, supra.* There is no evidence of an express disclaimer by either the Lynches or any of appellees' predecessors in title. In addition, until the dispute over the fence arose between these parties, appellees used the land in a manner consistent with the original amicable arrangement. Therefore, prior to this dispute, there was no notice to the Lynches by appellees or their predecessors in title of an intent to hold the instant property adverse to the Lynches' interest. Under these facts, we hold that

the circuit court's finding that appellees established title to the subject property by adverse possession is clearly erroneous. The circuit court's decree is reversed and remanded for the court to enter a decree consistent with this opinion.

Reversed and remanded.

VAUGHT, C.J., and HART, ABRAMSON, and HOOFMAN, JJ., agree.

GLADWIN, J., dissents.

GLADWIN, J., dissenting.

The question in this case is whether an amicable agreement to move a fence is tantamount to permission to use land. I find no law which supports that proposition; therefore, I respectfully dissent.

The majority opinion adequately sets forth the relevant law and facts of this case. The important fact is that the fence was moved by agreement of the parties with no intent to move the property line. The Lynches knew that they still owned and could control the use of the property on the appellees' side of the fence. That property was used by the Bateses and their predecessors in title to their own benefit. As these acts were done on property that the Lynches knew and claimed as their own, the Bateses' actions are an open, notorious, and hostile use of the land.

There is no evidence in the record that the Lynches gave permission to Dale Langford, the Masseys, or the appellees to use the land. The majority finds permission by implication through appellant's silence. Permission is defined as the act of permitting, *Websters II New Collegiate Dictionary,* (1st ed.2001). In this case there is no evidence that the Lynches gave anyone permission to use the "jog" property. The testimony specifically stated that the property line remained the same after

the fence was moved. Simply because property is not fenced does not mean that an adjoining landowner has permission to use that property.

I find no Arkansas cases where the concept of implied permission has been applied to adverse possession. On the contrary, there are three cases which seem to indicate that permission must be expressly given. In *State of Arkansas v. Hatchie Coon Hunting and Fishing Club Inc.*, 372 Ark. 547, 279 S.W.3d 56 (2008), the hunting and fishing club brought an |₈action, in which the State was joined as a party, seeking a determination that it owned an island that had been formed in a navigable river. The club argued that it had impliedly consented to flooding the island in question and that implied permission was sufficient to defeat the State's claim for adverse possession. *Id.* at 554, 279 S.W.3d at 60–61. The court disagreed, holding that there was no evidence that the club expressly consented to the permanent flooding. *Id.* at 558, 279 S.W.3d at 63. More was required on the part of the club to establish that it consented to the island's inundation. *Id.* at 558, 279 S.W.3d at 64.

In deciding *Hatchie Coon*, the supreme court adopted this court's reasoning in *White River Levee District v. Reidhar,* 76 Ark.App. 225, 61 S.W.3d 235 (2001), where landowners brought an action to quiet title in a parcel of the levee district's property that the landowners had adversely possessed for more than seven years. As in the instant case, it was admitted that there was no evidence that the levee district gave the landowners' predecessor in title express permission to clear and cultivate the land in dispute. *Id.* at 229, 61 S.W.3d at 238. The District argued that the mere existence of a benefit accruing to the District by virtue of the landowners' occupa-

tion implied the existence of permission. *Id.* Our court stated that no authority was cited for that proposition and that "we are unwilling to hold that a collateral benefit that results to the owner from a possessor's use is sufficient to declare the use permissive." *Id.* at 230, 61 S.W.3d at 238.

Finally in *Roberts v. Jackson,* 2011 Ark. App. 335, 384 S.W.3d 28, two members of the majority joined me in affirming the trial court's finding that Jackson had established a prescriptive easement. In *Roberts* there was testimony that Jackson's neighboring landowner, |₉Ms. Rogers, was "part of the family" and that Jackson assumed it was okay to be on the property between the houses. *Id.* at 5–6, 384 S.W.3d at 31–32. Rogers and her husband claimed that the only conclusion that could be made was that Jackson had actual or implied permission to use their property. *Id.* at 6, 384 S.W.3d at 32. We held that the trial court's finding of adverse use was not clearly erroneous stating that "there was no testimony that they (appellees) ever requested or were granted permission." *Id.* at 7, 384 S.W.3d at 32. Each of these cases indicate that permission must be expressly given.

My view of the testimony is that the moving of the fence was amicable. I cannot agree with the majority that the initial use of the property was amicable because there is simply no evidence in the record on that point. The Bateses bought the property adjacent to the jog and continued to use the jog as theirs. A landowner, acting under a mistake as to the true boundary, takes possession under an honest belief in ownership, and there is no adverse purpose. *Shirey v. Whitlow,* 80 Ark. 444, 97 S.W. 444 (1906). Here, the Bateses clearly intended to take to the fence, which is a hostile taking. Since the

1989 survey, the Bateses continued to exert control over the land known to be across the property line. I do not agree that the Lynches' silence equates to "permission to use the land." Therefore, I dissent.